Filed 9/29/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| ROBERT FINDLETON,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>COYOTE VALLEY BAND OF<br>POMO INDIANS,<br><br>    Defendant and Appellant. | A156459, A158171, A158172,<br>A158173, A159823<br><br>(Mendocino County Super. Ct.<br>  No. SCUK-CVG-12-59929) |

These five appeals arise out of a long running dispute concerning a construction contract and related equipment rental contract between Robert Findleton and the Coyote Valley Band of Pomo Indians (the Tribe). After the Tribe refused to pay Findleton for construction work and rental services he provided to the Tribe for a casino it was building and infrastructure for the reservation, Findleton invoked the mediation and arbitration provision of the agreements. The Tribe refused to mediate and (failing success) to arbitrate, and Findleton filed a petition in the Mendocino County Superior Court seeking to compel mediation and arbitration. The Tribe claimed the action was barred by sovereign immunity, and initially the superior court agreed, but on appeal we held the Tribe had expressly waived its sovereign immunity. On remand, the trial court heard Findleton's renewed motion to compel and entered an order compelling mediation and arbitration in

accordance with the rules of the American Arbitration Association (AAA), the firm chosen by the Tribe in the agreements it had prepared.

The Tribe doubled down, refused to mediate or arbitrate, threatened to disparage AAA if it proceeded, petitioned a recently established tribal court, sought to relitigate in that court the issues this court and the superior court had already decided, persuaded the tribal court to enjoin the arbitration and served the injunction on AAA, which at that point declined to mediate or arbitrate the dispute. In the meanwhile, the superior court had issued orders awarding Findleton attorney fees and costs, and subsequently it imposed monetary sanctions on the Tribe—none of which the Tribe has paid. Further, it issued writs of execution on the monetary judgments and orders to appear for examination of judgment debtor. At those proceedings, the Tribe's representatives repeatedly refused to answer questions about casino assets, and the Tribe impeded the examination by filling the room with tribal members who engaged in a vocal demonstration while the examination was taking place. The Tribe also transferred casino assets that were subject to execution to a corporate entity it created—a move the superior court found was a fraudulent transfer.

While continuing to flout the superior court's orders, the Tribe seeks to appeal from an order imposing sanctions under Code of Civil Procedure[1] sections 128.5 and 177.5 (in case number A156459), an order compelling discovery and imposing sanctions (case number A159823), an order requiring an undertaking to stay execution and setting aside the Tribe's fraudulent conveyance for purposes of this action (case number A158173), an order denying an exemption from execution (case number A158172) and orders

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

denying clarification of the order denying the exemption (case number A158171).

While these appeals were pending, Findleton filed a motion to dismiss them under the disentitlement doctrine based on the Tribe's violation of court orders and acts Findleton describes as fraud on the superior court.

We conclude that this is "one of the rare cases where applying this doctrine is appropriate due to [the Tribe's] flagrant[, repeated and continuous] violation of the [superior] court's orders." (*Blumberg v. Minthorne* (2015) 233 Cal.App.4th 1384, 1386.) We need not reach the issue of whether Findleton has established a fraud on the court because the Tribe's violations of the superior court's orders are more than sufficient to justify application of the disentitlement doctrine. These appeals are therefore dismissed, without prejudice to a motion for reinstatement if the Tribe complies with the superior court orders within 90 days.

## BACKGROUND

### I.

### *The Underlying Dispute*

The background facts about the parties' underlying dispute are set forth in our opinion in *Findleton v. Coyote Valley Band of Pomo Indians* (2016) 1 Cal.App.5th 1194, 1197-1202 (*Findleton I*), and we will not repeat them in full detail. Suffice it to say that in 2007, the Tribe entered into an agreement with Findleton to construct improvements on the Tribe's reservation in preparation for construction of a new gaming facility (the Agreement). The Agreement, prepared by the Tribe, was a form agreement issued by the American Institute of Architects (AIA) with various modifications. It contained mediation and arbitration clauses providing that the parties would mediate any disputes and, failing resolution at mediation,

3

arbitrate them. It provided that " '[a]rbitration shall be held in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise,' " that " '[t]he foregoing agreement to arbitrate . . . shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof,' " and that " '[t]he award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.' " (*Findleton I,* at p. 1199.) Initially, it also stated, " 'No term or provision in this Agreement shall be construed as a waiver of the sovereign immunity of the Coyote Valley Band of Pomo Indians. The Parties specifically agree that the sovereign immunity of Coyote Valley Band of Pomo Indians shall not be waived for disputes or other matters related to this Agreement.' " (*Ibid.*)

After the Tribe suspended construction in 2008 in the wake of the nationwide financial meltdown, Findleton and the Tribe amended the Agreement to provide that Findleton would perform additional work, that he would defer payment, that the Tribe would make payments with interest beginning the following year and that the Tribe would issue a resolution accepting these terms and approving a limited waiver of sovereign immunity. (*Findleton I, supra,* 1 Cal.App.5th at pp. 1200-1201.) The Tribal Council approved the amendment, along with a resolution waiving the Tribe's sovereign immunity pursuant to a previously adopted General Council resolution authorizing the Tribal Council to waive immunity on a limited basis in contracts relating to development of a new gaming and resort facility and related infrastructure and utilities. (*Id.* at p. 1202.) The waiver was limited to arbitration of disputes in order to avoid litigation in state court and recourse was limited to casino assets. (*Ibid.*)

4

Findleton performed the additional work and the tribal officials repeatedly acknowledged the Tribe's obligation to pay and promised it would pay once it was able, but later its counsel repudiated these assurances and told Findleton the Tribe would not pay him. (*Findleton I, supra,* 1 Cal.App.5th at p. 1202.) Findleton submitted a claim to the Tribe and received no response. Then he submitted a request for mediation and arbitration under the agreements. Again, the Tribe did not respond, in effect refusing to mediate or arbitrate. In March 2012, Findleton filed his petition to compel mediation and arbitration in the superior court. (*Id.* at pp. 1202-1203.)

## II.

### *Prior Appeals*

The pending appeals are the fourth through eighth filed in this case. We briefly describe the three earlier appeals for context. *Findleton I* was Findleton's appeal from the superior court's order denying the initial motion to compel mediation and arbitration on the ground that the Tribe had sovereign immunity. (*Findleton I, supra*, 1 Cal.App.5th at pp. 1196-1197.) We reversed the superior court decision, holding that the Tribe waived its sovereign immunity for purposes of enforcing the mediation and arbitration clauses and mediating and arbitrating its contract disputes with Findleton. (*Id.* at p. 1197, 1217.)

In *Findleton v. Coyote Valley Band of Pomo Indians*, A144072, an unpublished opinion issued in 2016, we reversed an award of prevailing party attorney fees to the Tribe in view of our reversal of the ruling on which the Tribe had prevailed.

*Findleton II,* the third appeal resulting in our second published decision, was the Tribe's appeal from an order awarding costs and attorney

5

fees incurred by Findleton in prosecuting his appeal. (*Findleton v. Coyote Valley Band of Pomo Indians* (2018) 27 Cal.App.5th 565, 568 (*Findleton II*).) We affirmed the superior court's fee award on two grounds. We declined to decide issues the Tribe had not raised in the superior court concerning the scope of the fee clause and whether it applied to enforcement of both agreements. (*Id.* at pp. 569-571.) We also declined to allow the Tribe to relitigate the question whether it waived its sovereign immunity because law of the case precluded it. (*Id.* at pp. 571-572.) We rejected the Tribe's argument that its waiver of sovereign immunity did not extend to the fee clause, holding that fees incurred to judicially enforce the right to arbitrate fell within the Tribe's waiver of immunity. (*Id.* at pp. 572-573.) We also rejected the Tribe's contention that the superior court should have stayed its hand based on comity grounds to allow the Tribe to exercise its right to self-government by resolving the dispute in a tribal court because several federal appellate courts had held a party is not required to exhaust tribal court remedies if a tribal court was not functional until after the complaint was filed, and "[h]ere, there was no evidence before the trial court indicating there was a tribal court in existence in 2012 when Findleton first filed his petition to compel arbitration in the superior court." (*Id.* at pp. 573-575 & fn. 7.)

## III.

### *Procedural History in the Trial Court*

In March 2012, Findleton filed a petition to compel mediation and arbitration under the agreements in the Mendocino County Superior Court. He alleged the Tribe had failed to pay him $831,483.53 owed under the Construction Agreement and $94,712.23 under the On-Site Equipment Rental Agreement, exclusive of interest.

6

The Tribe moved to quash service of the summons and dismiss for lack of subject matter jurisdiction on two grounds: that the Tribe had not waived its sovereign immunity or consented to suit in the state court and that Findleton's failure to exhaust tribal administrative remedies barred his claims and deprived the court of jurisdiction. The Tribe argued that the tribal official who signed the agreements between Findleton and the Tribe containing the arbitration clauses lacked authority to enter into them on behalf of the Tribe or to execute the resolution expressly waiving sovereign immunity and that Findleton had failed to comply with a tribal claims ordinance. Findleton proffered evidence that he had submitted a timely claim after learning the Tribe was refusing to pay him, and that the Tribe had failed to respond.

After discovery and briefing, the superior court ruled in May 2014 that the Tribe had not waived its sovereign immunity. It did not reach the alleged failure to exhaust. The Tribe then sought, and the court awarded it, prevailing party attorney fees under the agreements, Code of Civil Procedure section 1717 and a section of the Tribal Code.

Findleton appealed, and in July 2016 we reversed both decisions, holding the Tribe had waived its sovereign immunity with respect to enforcement of the agreements to arbitrate in this state's courts. (*Findleton I, supra,* 1 Cal.App.5th 1194.) We reversed the fee award because the Tribe was no longer a prevailing party. We remanded the case to the superior court for further proceedings. At the oral argument, in response to a question from the court, the Tribe's lawyer stated that the Tribe "now" had a tribal court but "at the time that this dispute arose," it did not.

On October 7, 2016, the day after we issued the remittitur in *Findleton I,* Findleton renewed his petition to compel mediation and

7

arbitration in the superior court.[2]  He also sought an award of fees he had incurred in the prior appellate proceedings.  (*Findleton II, supra,* 27 Cal.App.5th at p. 568.)

The Tribe opposed both motions, arguing the superior court should defer ruling on them until it resolved a demurrer the Tribe planned to file. (*Findleton II, supra,* 27 Cal.App.5th at p 568.)  The Tribe also argued, for the second time, that the case should be dismissed because the court lacked jurisdiction.  The Tribe claimed the state courts' exercise of jurisdiction would infringe on the Tribe's sovereignty and asserted that it had become a member of the Northern California Intertribal Court System (NCICS).  The superior court rejected the Tribe's request for a stay as to Findleton's attorney fee motion, granted the motion and awarded Findleton costs of $4,591.79 and attorney fees of $28,148.75.  The Tribe's appeal from the fee award resulted in our decision in *Findleton II*, affirming that ruling.  (*Id.* at p. 568.)

On November 18, 2016, the Tribe filed a demurrer, again arguing that "this court does not have subject matter jurisdiction over this dispute."  As the Tribe had requested, the superior court ruled on the demurrer prior to addressing the renewed motion to compel arbitration.  In February 2017, the superior court overruled the demurrer after taking judicial notice of various documents the Tribe proffered, reasoning, "There is no evidence that the Court the Tribe would like to now invest with jurisdiction to determine whether [*sic*] what they characterize as pre-arbitration disputes even existed at the time of the agreements in question.  There is no evidence that any party to the contract contemplated that any type of dispute between

---

[2] On November 3, 2016, the superior court vacated its prior order quashing service of summons on the Tribe.  It then vacated its earlier award of costs and fees to the Tribe.

8

Findleton and the Tribe be resolved by any means other than arbitration." Further, the court reasoned, "[t]here is no way to reconcile the express terms of the Tribe's agreements with Findleton with the concept that disputes relating to the agreement must be determined in some forum other than arbitration. The Tribe[']s current litigation position is not consistent with the course of conduct that resulted in the series of agreements with Findleton or the series of tribal resolutions related to the same."

The court rejected the Tribe's argument that Findleton's suit "impinges on tribal sovereignty," observing, "A Tribe's sovereignty remains intact and suit in state court is barred unless, and until, as here, the Tribe waives its sovereignty with respect to a dispute and, in effect, consents to state jurisdiction. This is what the Tribe did when it agreed to arbitrate disputes with Findleton. The Tribe chose its forum. The General Council authorized the Tribal Council to make such an agreement and the Tribal Council did make such an agreement. . . . [T]he appellate court found a waiver based on the General Council resolutions authorizing, and the Tribal Council resolutions approving, a waiver of sovereign immunity for the purpose of resolving disputes with Findleton. Given the pre-litigation course of conduct of the Tribe, the Tribe's recited reasons for waiving sovereign immunity to enable the Tribe [to] enter into contracts favorable to the Tribe, the series of agreements and resolutions drafted by the Tribe, Findleton has arguably met his burden of showing a clear waiver under the terms of the Construction and Rental Agreements as well."

In the meanwhile, while the superior court was holding off hearing Findleton's motion to compel arbitration and addressing the Tribe's demurrer first, as the Tribe had requested, the Tribe was engaging a tribal court, the

9

Coyote Valley Tribal Court (CVTC),[3] to "accept review of the Findleton case." In February 2017, the CVTC concluded it had jurisdiction, and in March 2017 it denied Findleton's motion to dismiss.[4] The Tribe then sought "review" of this court's decisions by that tribal court and proceeded to relitigate issues this court had already decided, including whether the Tribe had waived its sovereign immunity and whether the California courts have jurisdiction.

In March 2017, the Tribe filed further opposition to Findleton's motion to compel arbitration, arguing that the CVTC had agreed to review the state court decisions, that there had "not been an opportunity to seek tribal review until after the recent remand given the Tribe's position that it did not waive its sovereign immunity in any court," and that there had always been a judicial process in place in which Findleton could have sought relief.

Findleton responded, arguing the case had been pending in this state's courts for several years before the Tribe filed its petition in the tribal court, in its petition the Tribe sought to relitigate the issue of its waiver of sovereign immunity already decided by this court, and the Tribe's resort to a tribal forum "only recently created and not fully functioning to relitigate issues resolved by the court of appeals" was motivated to harass or conducted in bad faith. Citing *Krempel v. Prairie Island Indian Community* (8th Cir. 1997) 125 F.3d 621, *Johnson v. Gila River Indian Community* (9th Cir. 1999) 174 F.3d 1032, 1026 and other federal cases, Findleton argued that where there is no functioning tribal court at the time a plaintiff files his claim, exhaustion of tribal remedies is not required. The Tribe's assertion that there was always a tribal remedy, Findleton argued, was contradicted by

---

[3] Findleton contends the Tribe misrepresented that the tribal court it had engaged was an NCICS tribunal, an issue we will discuss further below.

[4] Findleton appeared specially to contest jurisdiction, but, after the tribal court denied the motion, did not participate.

the Tribe's claim that the first opportunity to seek review by the tribal court only recently arose, and the Tribe had not explained why it did not seek such review until after this court issued the remittiturs on the first two appeals in this case. Findleton also argued that under California law, the first of two courts with concurrent jurisdiction to assume jurisdiction over the subject matter takes such jurisdiction exclusively.

The Tribe then disputed Findleton's assertion that there was no functioning tribal court at the time he filed his state court action in March 2012, arguing the Tribal Constitution vested power in one Supreme Court and that the Intertribal Court was that court. The Tribe submitted evidence indicating the Tribe joined the NCICS, which was a collaboration of four tribes, on March 21, 2012, and that the NCICS applied for funding from the federal government sometime in 2012, that it hired a court manager in July 2013, and that it had a docket of cases in 2014 and was conducting hearings in those cases in 2015.

Findleton responded that the Tribe submitted no evidence that there was a functioning tribal court at the time he filed his petition, and that the Tribe's counsel had informed this court during oral argument in *Findleton I* that the Tribe had no tribal court "at the time this dispute arose." Further, Findleton argued that there was no provision in the Tribe's constitution to permit use of any intertribal court until the constitution was amended in October 2012, several months after Findleton filed his initial motion to compel arbitration. Findleton also referred to the memorandum of points and authorities the Tribe filed in support of its demurrer, in which it admitted that it had taken years after it first sought funding from the Department of Justice for the NCICS in 2012 before it actually secured that funding,

11

established rules and policies and established the requisite infrastructure and staffing for the NCICS court to be fully functional.[5]

In April 2017, the superior court granted Findleton's motion to compel mediation and arbitration, stayed the action pending the outcome of the mediation/arbitration, and set a case management conference for August 2017. It made the following findings:

"(i) The Appellate Court found that the arbitration clauses were clear enough;

"(ii) The arbitration was to be conducted under the Construction Industry Rules of the American Arbitration Association ('AAA');

"(iii) There is no dispute that the AAA Rules empower the arbitrator to rule upon his or her own jurisdiction, including any objections to the exercise, scope or validity of the arbitration agreement;

"(iv) There is no evidence any functioning Tribal Court existed at the time the dispute arose or when this action was filed;

"(v) There is no evidence that any party to the contract contemplated that any type of dispute between the parties would be resolved by any means other than arbitration;

"(vi) There is no way to reconcile the express terms of the Band's agreements with the concept that disputes relating to the agreement must be determined in some forum other than arbitration;

---

[5] Specifically, the Tribe had stated: "While it took several years after its establishment in 2012 to secure funding, establish its rules and policies, and establish the requisite infrastructure and staffing to be fully operational, the Intertribal Court is now the Tribe's tribal court and is able to take and handle cases and controversies."

"(vii) The Band's current litigation position is not consistent with the course of conduct that resulted in the series of agreements or the series of tribal resolutions related to the same;

"(viii) There is nothing about this suit that impinges on tribal sovereignty;

"(ix) When a tribe waives its sovereign immunity it, in effect, consents to state court jurisdiction and that is what the Band did when it agreed to arbitrate its disputes with Findleton. Therefore, this Court has jurisdiction to refer the parties to mediation/arbitration;

"(x) The Band chose the forum and selected and conferred upon the AAA the authority to determine all disputes between the parties, whether the disputes involve the Band's Claim Ordinance or not."

In June 2017, Findleton filed a request for mediation/arbitration with AAA. That same month, the Tribe filed a petition for writ of mandate in this court seeking to vacate the superior court's order compelling arbitration and to dismiss Findleton's petition to compel arbitration. Yet again, the Tribe argued that the superior court lacked jurisdiction, this time contending that "the Tribe's laws and the Agreements require exclusive tribal jurisdiction over the pre-arbitration dispute remaining after remand" and that the Tribe had petitioned the NCICS, and the NCICS had granted the petition, to review this court's decision. It further argued that the Tribal Council resolution that this court held was a waiver of the Tribe's sovereign immunity "expressly repudiated state court jurisdiction over disputes," and did not "evidence an intent to clearly and unambiguously waive the Tribe's immunity as to the Respondent Court to compel mediation and arbitration (and accordingly enforce any award) or to the AAA to determine all pre-arbitration disputes between the Tribe and Mr. Findleton."

13

In July 2017, the CVTC ruled in the Tribe's favor, held the Tribe had not waived its sovereign immunity, and declined to grant comity to this court's contrary ruling, observing that under the rules of that court tribal judges "are provided 'full and total discretion'" regarding comity and opining that the state courts lacked jurisdiction.

On August 14, 2017, this court denied the Tribe's petition for writ of mandate and dissolved the temporary stay of the superior court's order compelling arbitration, and on August 28, 2017, the California Supreme Court denied the Tribe's petition for review.

In August 2017, the Tribe refused to participate in the AAA administrative conference, and in September 2017 it refused to participate in mediation or arbitration. It contended that by participating, when the state courts and tribal court had issued "diametrically opposed decisions," the AAA would be "picking one court order over another" and threatened that if the AAA "continue[d] to attempt to assert jurisdiction in this matter, we will be obligated to publicize AAA's flippant disregard of tribal law, tribal courts and tribal sovereignty." The Tribe then filed a motion in the CVTC for a temporary restraining order and preliminary injunction to prevent Findleton and AAA from proceeding with mediation and arbitration.

In October 2017, the CVTC granted the temporary restraining order. In response, AAA stayed the mediation/arbitration proceedings. In December 2017, the CVTC granted the Tribe's request for a permanent injunction enjoining AAA and Findleton from initiating arbitration or otherwise enforcing the arbitration clause contained in the Agreements. In response, AAA closed the mediation/arbitration proceedings pending before it.

14

In June 2018, Findleton filed a motion for sanctions pursuant to sections 128.5 and 177.5, arguing that the Tribe's refusal to comply with the court's order compelling arbitration by failing to participate in AAA arbitration and obtaining an injunction from the CVTC to prevent the AAA from proceeding with the arbitration were sanctionable. The Tribe opposed the motion, arguing, among other things, that section 128.5 did not apply to this case, the Tribe's actions were not in bad faith, frivolous or solely for purposes of delay, the Tribe had permitted AAA to decide the issue of arbitrability, the superior court lacked jurisdiction and the Tribe was immune from sanctions. In reply, Findleton argued, among other things, that the Tribe's contention that it participated in arbitration and that AAA decided the matter was not arbitrable was a misrepresentation and that the Tribe could not relitigate the issue of its sovereign immunity, which the state courts had already decided, and that by filing a demurrer and moving for attorney fees, the Tribe waived its sovereign immunity and conferred jurisdiction on the superior court.

In December 2018, having sought supplemental briefing and held two hearings, the superior court granted the sanctions motion in a six-page order containing the following findings:

"Consistent with the Order Compelling Arbitration, on June 9, 2017, Mr. Findleton filed a Request for Mediation/Arbitration with AAA. The Tribe refused to participate in the mediation or arbitration, and explicitly told AAA on several occasions that it would not do so.

"Instead, on September 8, 2017, the Tribe threatened AAA that if it entertained Mr. Findleton's Request for Mediation/Arbitration, it would 'publicize AAA's flippant disregard of tribal law, tribal courts and tribal sovereignty.' Then, on September 15, 2017, the Tribe filed a petition in its

15

tribal court to seek and obtain a ruling contrary to this Court's order compelling mediation and/or arbitration, aimed expressly to enjoin AAA from proceeding with the mediation and/or arbitration. On October 2, 2017, the Tribe's court issued a Temporary Restraining Order against AAA, which purported to temporarily enjoin AAA from proceeding with the mediation or arbitration. In response, AAA stayed further proceedings. On December 20, 2017, the Tribe's court issued an order granting permanent injunction, which purported to permanently enjoin AAA from proceeding with the mediation or arbitration. As a result, AAA closed their file and declined to hear the mediation or arbitration.

"Though at each stage the Tribe has argued that the trial court lacks jurisdiction to take any action in this dispute, as the recent appellate opinion points out, in *Findleton I*[,] 'we necessarily decided that the tribe had waived its sovereign immunity and therefore conferred jurisdiction on the superior court . . . , not to resolve the underlying dispute but to enforce the arbitration clauses in the agreements.'

". . . The appellate opinion on the third appeal found that the tribe had waived sovereign immunity with respect to a claim for fees Findleton incurred in enforcing his right to arbitrate. The same opinion dispenses with the Tribes' comity argument. *There was no evidence of a functioning tribal court in 2012 when Findleton filed his Petition to Compel Arbitration in state court*." (Italics added and omitted.)

The superior court further found, "The petition filed by the Tribe in its tribal court in September 2017 was more than just a separate track of proceedings. The action was part of a civil case filed after January 1, 2015, designed to negate this Court's order compelling mediation and/or arbitration. . . . Further, the facts demonstrate the tribal finding was

16

intended for the purpose of negating this Court's order. The petition was filed after, and in response to, this Court's order. It, and the Tribe's communications with AAA, were meant to intimidate the AAA from hearing the matter submitted by Mr. Findleton, directly contradicting and in contempt of this Court's order to compel the Tribe to submit to mediation and/or arbitration. Accordingly, the facts meet the bad faith standard of section 128.5[, subdivision] (a)."

Under section 128.5, the court awarded sanctions of $70,500 for fees and costs incurred by Findleton to the Morgan Lewis firm, $9,315 for fees he incurred to attorney Pemberton, and $6,642 for costs he paid directly. It awarded those fees as sanctions and, in the alternative, as prevailing party fees incurred by Findleton as part of his "continuing quest to enforce his contractual right to arbitrate." It ordered the Tribe to pay those fees and costs to Findleton "within 30 days of service of this order." Under section 177.5, it imposed a sanction of $1,500 payable to the court within 30 days unless within that period the Tribe submitted to mediation and, if not successful, arbitration. The court served the order on counsel for the parties on December 10, 2018.

In February 2019, the Tribe filed a motion seeking an exemption from enforcement of a money judgment. It claimed that under the terms of the waivers of sovereign immunity granted to Findleton, his recourse was limited to casino assets; the Tribe had no casino assets; and the casino and its assets "are owned by Coyote Valley Entertainment Enterprises ('CVEE'), a Tribally chartered subdivision of the Coyote Economic Development Corporation ('CEDCO'), a federally chartered Section 17 corporation wholly owned by the Tribe." The Tribe further contended that these two entities were "cloaked in

17

the privileges and immunities of tribal sovereignty" and that "[a]ll Casino assets were transferred from the Tribe to CVEE on November 16, 2017."

In March 2019, the Tribe filed a "Motion for Clarification" requesting that the superior court "clarify" three orders awarding fees and costs to Findleton in February and March 2019 and the December 2018 order imposing sanctions on the Tribe, by adding language stating, "recourse is limited to casino assets."

In April 2019, the superior court denied the Tribe's motion for exemption from enforcement of a money judgment. It also denied the Tribe's motions for clarification of prior orders awarding fees and sanctions, concluding that "the challenged orders of this Court require no addition[al] interpretation with respect to the words 'Casino assets' " and "that in pursuing recourse against the 'Casino assets' Plaintiff may question Defendant, CEDCO, CVEE or any of their officers, representatives, employees or agents and undertake such investigation as may be permitted by applicable law during the course of the debtor's examination concerning any asset that was held in an account of the Defendant's casino business during the term of the contract between the parties or any asset traceable to such account regardless of the party to whom or the account to which it was transferred."

Also in April 2019, the superior court granted Findleton's motion for an order requiring the Tribe to post an undertaking to stay execution of the order awarding sanctions and directing issuance of a writ of execution. The court found there was no automatic stay of execution of the sanctions order or other money judgments issued by that court, that such judgments were "subject to immediate execution against any and all of [the Tribe's] casino assets, traceable to accounts of [the Tribe] used during the term of the

18

contracts that are the subject of this action and have been putatively transferred to any entity controlled by [the Tribe], regardless of the nominal owner of such assets at present or any putative conveyance of such assets to any putative third-party corporate entity."

The superior court further found "that the November 16, 2017 putative transfer of any or all of [the Tribe's] casino assets to any third-party corporate entity controlled by [the Tribe] constitute[d] an inequitable or fraudulent conveyance that is not judicially cognizable under the federal common law doctrine of equitable estoppel or the state law doctrines of judicial estoppel or evidentiary estoppel under Evidence Code section 623." The court set aside "the putative transfer of any and all of the casino assets that allegedly occurred on November 16, 2017 between [the Tribe] and [CVEE], as a subdivision and subordinate economic entity of [CEDCO], putatively formed and operating pursuant to section 17 of the Indian Reorganization Act of 1934 . . . ." It further ordered that such transfer would "not be deemed judicially cognizable or legally effective as far as [Findleton's] execution of any money judgment issued by this Court is concerned," that casino assets traceable to accounts used during the term of the contracts and transferred to any entity owned by the Tribe would be "deemed available for execution, attachment, garnishment or levy or any other lawful encumbrance in satisfaction of any money judgment issued by this Court regardless of the putative current owner" or the "putative conveyance," and that such assets could be treated by Findleton, for purposes of execution of any money judgment issued by the court, "as if such casino assets were legally owned and controlled directly by [the Tribe]."

The Tribe appealed from the order awarding sanctions (case number A156459) and the order granting the motion for an undertaking (case number

19

A158173), but neither deposited the undertaking with the court, as necessary to stay the sanctions order, nor paid the sanctions.

In December 2019, the superior court granted Findleton's motion to compel responses to his first set of requests for production of documents. Finding the Tribe had the legal right to obtain on demand "any and all responsive documents in the possession of [CEDCO] and [CVEE] under the legal control test," the court ordered the Tribe to produce and serve on Findleton without objections all responsive documents, including those in possession, custody, or control of the Tribe, its attorneys, CEDCO and CVEE and to do by January 16, 2020. The court awarded sanctions against the Tribe in an amount to be determined on January 2, 2020. On that date, having held a further hearing on the amount of sanctions, the court awarded Findleton, as sanctions against the Tribe, costs and attorney fees totaling about $12,000.

## IV.

### *Motion to Dismiss Pending Appeals*

In his motion to dismiss the five pending appeals, Findleton asserts the Tribe has violated many superior court orders.

First, he contends, and the Tribe does not dispute, that it has refused to participate in the mediation or arbitration that the superior court ordered in April 2017. The superior court found the Tribe's efforts to avoid and prevent AAA and others from complying with its order were in bad faith and in contempt of its order.

Second, he asserts the Tribe has failed to pay the amounts the court ordered it to pay to Findleton for (1) attorney fees and costs incurred as sanctions, (2) discovery sanctions and (3) prevailing party fees amounts that total about $230,000. It failed to pay the $86,457 sanctions amount

20

notwithstanding that it failed to post the undertaking the court ordered to stay the sanctions order.

Further, Findleton contends his efforts to collect on these judgments have been thwarted by actions of the Tribe. Not only did the Tribe transfer assets in November 2017 in a transaction the superior court held was a fraudulent conveyance and fail to inform Findleton or the court it had done so for more than a year, but thereafter it stymied Findleton's efforts to obtain discovery concerning those assets. It failed to produce any documents in the possession of the entity to whom it had transferred the assets (CVEE) and that entity's parent company (CEDCO), resulting in the superior court granting Findleton's motion to compel and for sanctions, an order that is the subject of one of the appeals in this case (A158173). It proffered a witness at the debtor's examination on April 26, 2019, who refused to answer any questions based on a testimonial privilege asserted by her counsel. Her counsel claimed the tribal court order precluded her from participating in the proceedings and contended she could not answer questions about assets held by CVEE because that entity had not waived sovereign immunity. The Tribe obstructed the debtor's exam even though the court had already ruled that any casino assets transferred to other entities were subject to execution. After the superior court ordered her to answer the questions, the witness claimed she had been ordered by the tribal court not to participate in the proceedings, admitted she had just been elected tribal treasurer and was unfamiliar with the responsibilities of the position and said she did not know the answers to the questions about CEDCO, CVEE or the Tribe's casino assets.[6] The Tribe, knowing, but not having informed the court, that it had

---

[6] On April 16, 2019, the tribal court, on the motion of the Tribe, had issued an order purporting to permanently enjoin Findleton "and all those in

21

transferred the casino assets to CVEE, had brought a witness from the Tribe who was knowledgeable about the casino assets that were subject to execution. At a later hearing, the court aptly described this debtor's examination as "a sham."

At a subsequent debtor's exam, in October 2019, the Tribe objected to the orders of examinations the day before they were scheduled to occur, several of the proposed examinees failed to appear and the court continued the examination to address the Tribe's objections. At a third session, in November 2019, the Tribe brought only one of two witnesses the court had ordered to appear, and informed the court the witness would not answer questions because of an order issued by the tribal court. At that examination, a crowd of tribal members appeared holding protest signs and interrupting the examination with comments, jeering and laughing. The witness who did appear, the tribal chairman, refused to answer questions about his role in CVEE and about casino assets and finances, asserting that a tribal court order prohibited him from participating in the debtor's examination.

Findleton argues that, in view of the Tribe's violation and obstruction of the orders compelling arbitration, compelling production of documents and imposing discovery sanctions, and the orders awarding monetary relief as prevailing party fees and sanctions, this court should dismiss the five pending appeals under the disentitlement doctrine.

---

active concert or participation with him and any individual including officers, staff and representatives of the Tribe" from "engaging in judgment collection proceedings in the State Court (including conducting a Debtor's Examination) against the Tribe's property" and enjoining Findleton from "taking any action to perfect a lien, levy, or garnishment on the Tribe's personal property, or engage in any other action to collect any Foreign Judgement, without first moving to domesticate such judgment in the Tribal Court . . . ."

Findleton also accuses the Tribe of committing "fraud on the court" in connection with the CVTC. He contends the Tribe falsely represented the CVTC as "a duly constituted court of the [NCICS]" and "fail[ed] to reveal that the Tribe was at all times during this litigation operating simultaneously under two inconsistent tribal constitutions," under one of which the tribal judge could not serve because he was not a member of the Tribe. He proffers, among other things, documents obtained in response to FOIA requests and the declaration of a former NCICS employee that he contends expose this fraud. He contends this fraud on the court provides a further ground for dismissing the appeals.

Findleton argues that we should dismiss the appeals from the orders denying an exemption from money judgments, denying a motion for clarification of four orders granting Findleton monetary relief, and granting Findleton's motion for an undertaking because those orders are interlocutory and non-appealable and we therefore lack jurisdiction over them. Further, he argues the appeal from the order compelling production of documents and awarding sanctions is only appealable with respect to the amount of the sanctions and not with respect to the merits of the discovery order.

## DISCUSSION

### I.

### *Jurisdiction*

We first address Findleton's appealability arguments, since they are jurisdictional. Findleton claims the orders denying the exemption from a monetary judgment, denying the Tribe's request to clarify four orders granting monetary relief, granting an undertaking and compelling asset-related discovery (except the part of the order that awards monetary sanctions), are interlocutory and thus not appealable under section 904.1,

23

subdivision (a)(1).  That subdivision excludes from appealable judgments "an interlocutory judgment," with certain exceptions not relevant here.  Findleton claims these three orders are interlocutory because they leave issues open for future consideration.  Specifically, these orders do not "terminate[] the litigation or completely resolve[] all the issues between the parties."

However, Findleton overlooks section 904.1, subdivision (a)(2) of the statute,[7] which allows an appeal to be taken "[f]rom an order made after a judgment made appealable by paragraph (1)."

Here, the parties do not dispute that the orders awarding sanctions and attorney fees were final and appealable.  Indeed, the Tribe appealed from many of them.  (E.g., *Findleton II*, *supra*, 27 Cal.App.5th 565 [appeal from order awarding fees incurred by Findleton on appeal]; A156459 [appeal from order imposing sanctions]; A159823 [appeal from order imposing discovery sanctions]; see § 904.1, subd. (a)(11), (12) [interlocutory judgment or order directing payment of monetary sanctions by a party is appealable if amount exceeds five thousand dollars].  Orders granting fees or costs are treated as final judgments under the collateral order doctrine.  (*Apex LLC v. Korusfood.com* (2013) 222 Cal.App.4th 1010, 1016 [order granting attorney fees qualifies as appealable collateral order]; *Serrano v. Stefan Merli Plastering Co.* (2008) 162 Cal.App.4th 1014, 1026 [orders requiring party to pay costs appealable under collateral order doctrine]; cf. *Alioto Fish Co. v. Alioto* (1994) 27 Cal.App.4th 1669, 1686-1687 [order awarding fees was enforceable judgment for purposes of Enforcement of Judgments Act].)  This includes fees and costs awarded as sanctions.  (*Bauguess v. Paine* (1978)

---

[7] The Tribe does not invoke this subdivision of the statute either. Nonetheless, we have a sua sponte duty to determine whether we have jurisdiction under the applicable statutes and case law.

24

22 Cal.3d 626, 634 fn. 3, superseded by statute on other grounds as stated in *Olmstead v. Arthur J. Gallagher & Co.* (2004) 32 Cal.4th 804, 809).

The orders Findleton asks us to dismiss as nonappealable orders—those denying an exemption from execution, requiring an undertaking to stay the judgment, and denying clarification of the monetary judgments—are "order[s] made after" these collateral orders, which are the same as judgments for purposes of section 904.1.  Thus, they are appealable under section 904.1, subdivision (a)(2).

As the leading treatise on California appellate law states, "Any order made to *enforce a judgment* (e.g., directing execution) or to *prevent its enforcement* (staying execution) is appealable under . . . § 904.1[, subd.] (a)(2)."  (J. Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2019) ¶ 2:155 (Eisenberg).)  The treatise cites *Marriage of Green* (2006) 143 Cal.App.4th 1312, which held that an order quashing a writ of execution "is appealable as a special order after judgment relating to the enforcement of the judgment."  (*Id.* at p. 1319.)  The orders here, in which Findleton sought to enforce the judgments while the Tribe sought to limit their enforcement are "special order[s] after judgment[s] relating to the enforcement of the judgment[s]" appealable under section 904.1, subdivision (a)(2).

## II.

### *Disentitlement*

Courts cannot function if their orders and judgments are routinely ignored by litigants or their counsel.  The law provides methods for challenging trial court judgments and orders, such as appeals, petitions for writs of mandate and requests to stays of execution pending appellate proceedings.  When such legally provided processes are not successful or have

not been employed, that does not mean litigants are free to ignore or refuse to comply with subsequent trial court orders. "A trial court's judgment and orders, all of them, are presumptively valid and must be obeyed and enforced. [Citation.] They are not to be frustrated by litigants except by legally provided methods." (*Stone v. Bach* (1978) 80 Cal.App.3d 442, 448.)

As our Supreme Court has said, "A party to an action cannot, with right or reason, ask the aid and assistance of a court in hearing his demands while he stands in an attitude of contempt to legal orders and processes of the courts of this state." (*MacPherson v. MacPherson* (1939) 13 Cal.2d 271, 277.) "It is contrary to the principles of justice to permit one who has flaunted the orders of the courts to seek judicial assistance." (*Estate of Scott* (1957) 150 Cal.App.2d 590, 594.) This doctrine, known as "disentitlement," recognizes an appellate court's "inherent power . . . to dismiss an appeal by a party that refuses to comply with a lower court order." (*Stoltenberg v. Ampton Investments, Inc.* (2013) 215 Cal.App.4th 1225, 1229 (*Stoltenberg*).) Dismissal is not a punishment for a party's contemptuous acts. (*Id.* at p. 1230.) Rather, it is an equitable tool, allowing an appellate court to " ' " ' "use its processes to induce compliance" ' with a presumptively valid order." ' " (*Ibid.*) "No formal judgment of contempt is required; an appellate court 'may dismiss an appeal where there has been *willful disobedience or obstructive tactics.*" (*Ibid.*) "The doctrine 'is based upon fundamental equity and is not to be frustrated by technicalities.' " (*Ibid.*)

Court's do not lightly apply the disentitlement doctrine. A party's obstruction of, or failure to comply with, trial court orders must be willful. (See, e.g., *People v. Puluc-Sique* (2010) 182 Cal.App.4th 894, 901 [declining to apply doctrine to defendant who stopped reporting to probation officer after being deported, observing, "Appellate disentitlement is a discretionary

26

doctrine that must be applied in a manner that takes into account the equities of the individual case"].)

Application of the disentitlement doctrine here is amply justified. The Tribe has willfully refused to comply with the trial court's order compelling mediation and arbitration on an ongoing basis for four years. There can be no doubt that its failure to comply over this lengthy period is deliberate and willful. It refused to participate in the AAA administrative conference and refused to participate in mediation or arbitration. As the superior court found, it sought "to intimidate" AAA, which the Tribe itself had chosen to mediate and arbitrate, threatening to publicly announce AAA's "flippant disregard of tribal law, tribal courts and tribal sovereignty" if AAA continued to assert jurisdiction over the matter. The Tribe then sued AAA (and Findleton) in a tribal court that did not exist when Findleton filed this case and persuaded it to issue a TRO and injunction to prohibit AAA from proceeding with the mediation/arbitration the superior court had ordered. Its actions were, as the superior court found, *"designed to negate this Court's order compelling mediation and/or arbitration."* (Italics added.)

The Tribe further violated at least five orders awarding fees and costs to Findleton, three as prevailing party fees and two as sanctions under the discovery statute and sections 128.5 and 177.5. Although none of these orders was stayed, including none of the sanctions orders that are currently on appeal, the Tribe has not paid any of them. Moreover, when the Tribe's effort to obtain an order that it was exempt from these monetary orders was unsuccessful, it engaged in myriad extra-legal means of obstructing Findleton's efforts and the trial court's orders pertaining to collection. It refused to provide written discovery about its assets as ordered by the superior court, engaged in "sham" debtors' exams, and fraudulently

27

transferred the casino assets to a tribally owned entity it claimed was cloaked in sovereign immunity.

The Tribe does not deny these facts. Rather, it raises a host of legal and equitable defenses, none of which is persuasive.

For example, it claims the motion to dismiss is "untimely." Motions to dismiss in the court of appeal are not subject to prescribed time limits; "[t]he appropriate time-frame is usually dictated by the ground on which the motion is based, and may also be affected by certain practical considerations . . . ." (Eisenberg, *supra*, ¶ 5:39; see Cal. Rules of Court, rule 8.54.) To the extent the Tribe's argument is that the motion is improper because "it requires an examination of the record or a consideration of the underlying merits of the appeal," it is incorrect. The appeals involve the Tribe's challenges to several court orders; the motion does not focus on the merits of those orders but addresses the Tribe's failure to comply with those and other orders made by the superior court.

It is true that efficiency would have been better served if Findleton had filed the motion earlier, before briefing in most of these appeals was complete. On the other hand, Findleton informed the Tribe and this court that he intended to file a disentitlement motion in August 2020, before most of the briefs had been filed, and the Tribe could have sought a stay of the briefing schedules pending resolution of the motion. More significantly, the Tribe should not be heard to complain about inefficiency given the extraordinary multiplicity of actions and proceedings its own conduct has engendered. In any event, while failure to bring the motion earlier may be a factor to consider in assessing whether disentitlement is equitable, it is not a bar. And in our view, it does not weigh heavily given the Tribe's ongoing violations and obstruction of multiple superior court orders.

The Tribe also contends the motion to dismiss is "an impermissible merits-based attack relating to conduct that pre-dates the appeals." Again, it cites no authority, which is ground enough for rejecting the argument. (*Berger v. California Ins. Guarantee Assn.* (2005) 128 Cal.App.4th 989, 1007 [failure to cite any authority to support contention constitutes waiver of issue on appeal].) Even considering the contention on the merits, the factual premises are false. The Tribe may have *begun* to violate some of the pertinent orders prior before these appeals were initiated, but its violations are continuing through the present. Thus, the Tribe continues to flout these trial court orders, and the purpose of the disentitlement doctrine—inducing compliance with court orders—is strongly implicated. Nor do we view the motion as an attempt to reargue the merits of the appeals. It focuses on the Tribe's disregard of court orders and its obstruction of their enforcement, not on whether the appeals are meritorious.

The Tribe argues that "compliance with the order compelling arbitration is moot because the AAA decided to close the case." It describes the AAA decision not to proceed as a determination by AAA "that it lacked jurisdiction to arbitrate." It cites nothing in the record supporting this assertion, and, in view of its threat to AAA and the tribal court orders purporting to enjoin AAA from proceeding, there is no reason to conclude that AAA decided anything other than that it was not inclined to proceed in the face of the threats, the cost of the litigation the Tribe filed against it and its unwillingness to violate a tribal court order. That is the only reasonable inference that can be drawn from the AAA letter closing the file, which simply confirms receipt of the tribal court order and states it has closed the matter retroactive to the date of the tribal court restraining order. Nor does the fact that the AAA declined to reopen the case after Findleton sought

reconsideration demonstrate otherwise.  Again, the letter from which the Tribe quotes states only that in accordance with the tribal court permanent injunction, "the matter will remain closed."  Finally, to the extent the Tribe is suggesting its successful effort to prevent AAA from mediating or arbitrating the case precludes the trial court from granting effective relief, we disagree. (See § 1281.6 [procedure when arbitrator appointed fails to act]; see also 9 U.S.C. § 5 [similar].)

The Tribe's primary argument is that it should not be subject to disentitlement for violating the trial court orders because it "was unable to comply."  Specifically, the Tribe claims the orders denying it an exemption and denying clarification of the money judgments were in conflict with the tribal court order restraining Findleton, those in concert with him, and "any individual including officers, staff and representatives of the Tribe" from "engaging in judgment collection proceedings in the State Court" (including conducting a debtor's examination) against the Tribe's property.  It is "impossible to comply" with the superior court orders that are on appeal, the Tribe argues, because the tribal court injunction prohibits tribal representatives from participating in debt collection proceedings.

The argument lacks merit for several reasons.  First, the Tribe has flagrantly violated the superior court's order compelling mediation and arbitration, which is not in conflict with the injunction against participating in debt collection proceedings.  The Tribe does not argue, and for good reason, that participating in the mediation/arbitration would conflict with the tribal court order purporting to enjoin Findleton and AAA from doing so, since that order does not purport to enjoin the Tribe.  But even assuming there was such a conflict, it would be one of the Tribe's own making.  The Tribe is not duty bound to continue flouting the superior court order compelling

30

mediation and arbitration. It is fully within the Tribe's own control whether to do so. It could voluntarily dismiss the tribal court proceeding just as it voluntarily filed that proceeding years after the superior court action was underway.

The same is true for the money judgments the Tribe has failed to comply with. Nothing in the tribal court orders precludes the Tribe from paying the money judgments, or at least it has failed to demonstrate any such bar. If it simply paid those judgments, there would be no need to engage in collection proceedings at all. It has not shown that it lacks control over the entities to which it transferred the casino assets out of which any judgments in favor of Findleton were to be satisfied. CEDCO is wholly owned by the Tribe, and CVEE is wholly owned by CEDCO. And the record strongly suggests the Tribe has such control.[8] And even if something in one of the tribal orders did preclude payment of the judgments, the Tribe has never explained why those orders, obtained based on its own petitions in the tribal court, could not be addressed simply by voluntarily dismissing the tribal court actions or withdrawing the request for such relief.

Relatedly, the Tribe argues that the superior court found its refusals to comply with court orders "neither contemptuous nor voluntary." The Tribe distorts the record.

---

[8] In connection with discovery proceedings, the superior court found the Tribe "has the legal right to obtain upon demand of any and all responsive documents in the possession of [CEDCO and CVEE] under the legal control test." The Tribe's chairman, the president of CEDCO and the president of CVEE at the time of the asset transfer were one and the same person. CEDCO was wholly owned by the Tribe. CVEE was a "subdivision" of CEDCO.

In imposing monetary sanctions against the Tribe, the superior court found the Tribe's acts were "*designed to negate this Court's order compelling mediation and/or arbitration*," were "*contradicting and in contempt of this Court's order to compel the Tribe to submit to mediation and/or arbitration*" and "[*met*] *the bad faith standard of section 128.5, subdivision (a).*" (Italics added.) In denying the Tribe's motion it found "that the November 16, 2017 putative transfer of any or all of [the Tribe's] casino assets to any third-party corporate entity controlled by [the Tribe] constitute[d] *an inequitable or fraudulent conveyance.*" (Italics added.) And in describing the debtor's examination to which the Tribe brought a witness who was both unwilling and unable to answer questions about the casino assets it said, "that OEX was a *sham.*" (Italics added.)

The Tribe quotes from comments the superior court judge made about sanctioning the individual witnesses who attended and declined to answer questions. The court noted, "Why should I sanction people who are apparently, in good faith—[¶] . . . trying to obey the order of another court? You know, a typical examinee or deponent isn't going to understand the principles of comity and how we got to where we are from a technical, legal standpoint." Later, however, after making a similar comment, the court made perfectly plain its view did not extend to the Tribe itself, observing, "That same analysis doesn't really apply to the entity in question here, that's the actual defendant. *The entity has chosen not to comply with this Court's order as part of its legal strategy and it continues to stonewall the efforts of the plaintiff to gain information in the aid of collection.*" (Italics added.) The court then granted Findleton's motion to compel the Tribe to produce documents and imposed monetary sanctions. And, despite the lack of any stay pending appeal, the Tribe has not complied with that order.

Finally, the Tribe invokes equity, which we agree is appropriate in the disentitlement analysis. It argues "the equities do not favor [Findleton]" and proffers six reasons, two of which repeat arguments we have already found unpersuasive (use of the motion to address the merits of the appeals and to address conduct that predates the orders on appeal) and one of which (delay in filing the motion) is not very weighty in the context of the Tribe's conduct. The only new arguments the Tribe raises as weighing against Findleton on the equities are its contentions that (1) Findleton's arguments about the tribal court and its provenance and about the Tribe having relied on multiple different versions of its Constitution constitute a "fraud on this Court of Appeal," (2) the declarants Findleton has relied on for those arguments "have known histories of harassment and personal animus towards the Tribe, its officials, its legal counsel and Indian Tribes generally," and (3) Findleton has unclean hands because the Tribe's investigation of him "revealed that [he is] caught in an embezzlement matter with his family, for which he has agreed to repay them from the proceeds of this litigation."

We are familiar with the history of this litigation, having ruled on three appeals and a petition for writ of mandate. Further, we have reviewed the voluminous record relating to this motion. As to the tribal court and Findleton's assertions about it, there has been no fraud on this court. There were irregularities in the proceedings of the tribal courts and the Tribe's communications with the court and Findleton that contributed to his beliefs that CVTC was not part of the NCICS and that the CVTC judge was not an NCICS judge. For example, the Tribe submitted a declaration by its Tribal Administrator, who had previously worked for the NCICS, which included a statement that in effect declared that the CVTC and NCICS are distinct: "In addition to being part of the NCICS consortium, the Tribe has its own court

33

system, the Coyote Valley Tribal Court." Similarly, the Chair of the Judicial Council of the NCICS signed a letter to Findleton's counsel confirming "that the 'Coyote Valley Tribal Court,' as well as the 'Coyote Band of Pomo Indians Tribal Court,' is **NOT** associated, connected or related to the Northern California Intertribal Court System ('NCICS')" and that "Judge Joseph J. Wiseman's identification as the 'Chief Judge, Northern California Intertribal Court System,' as reflected on the signature block of his March 13, 2019 Notice of Hearing, was performed without permission, and not authorized by the NCICS."

In presenting his arguments, Findleton's counsel has explained the factual basis for his assertions, making plain he is drawing inferences from documents and has provided the documents to the court. The Tribe has proffered a contrary narrative, based on a very recent tribal resolution responding to Findleton's assertions and a similarly recent NCICS resolution, on which the tribal resolution relies. The Tribe requests judicial notice of both resolutions. Putting aside whether and to what extent the truth of the matters asserted in the two resolutions may be considered by this court, their assertions do not show any fraud on this court. Nothing in them indicates that Findleton or his counsel were provided with the information they contain prior to filing the motion to dismiss notwithstanding his having sought the information. Nor do they explain all of the information presented by Findleton and his counsel.

Likewise, Findleton's assertion that the Tribe failed to reveal it was operating under two inconsistent tribal constitutions is not without justification. The Tribe's presentation of its tribal constitution and laws in this case has been inconsistent, incomplete and confusing. (See, e.g., *Findleton I, supra,* 1 Cal.App.5th at p. 1207, fn. 9.)

Finally, the Tribe asserts in its brief that the equities do not favor Findleton because, according to a Tribal Council resolution, it conducted an investigation revealing that (1) Findleton is "caught in an embezzlement matter with his family, for which he has agreed to repay them from the proceeds of this litigation, pushing him to take extreme measures to reopen the arbitration" and (2) "he has banded together with people, including his legal counsel, who have known histories of harassment and personal animus" toward the Tribe "and Indian tribes generally." In its request for judicial notice, the Tribe contends these materials show "Mr. Findleton's claims regarding the nature of the Tribal Court and Tribal Constitution are irrefutably false and that "Mr. Findleton and his collaborators have both the motive and history for fabrication."

These assertions are scurrilous and have no place in this appeal.[9] They pertain to disputes completely unrelated to the appeals in this breach of contract action[10] and, more problematic, serve no purpose other than to

---

[9] We deny the Tribe's request that we take judicial notice of the Tribal Resolution and the attached materials with the exception of the Judicial Council Resolution, which we grant for the limited purpose of addressing the Tribe's contention that Findleton's assertions about the tribal court constituted a fraud on the state courts.

[10] The tribal resolution relies on inadmissible hearsay documents concerning a family trust dispute and a business dispute between Findleton and a member or members of his family who accused him of malfeasance. There is no indication that any of those matters were resolved by a court, and the trust litigation apparently was settled and voluntarily dismissed.

The resolution also relies on hearsay documents, including a declaration its counsel (Little Fawn Boland) submitted to the Tribal Council in connection with its "investigation" into Findleton's counsel, Dario Navarro, concerning disagreements between Ms. Boland and Mr. Navarro in connection with another tribe they apparently jointly represented and a tribal court's determination 25 years ago that he had been practicing law on the reservation of a tribe without having been admitted to the tribal court's

impugn the motives and integrity of an opposing litigant, his counsel and the witnesses on whom he relies.

"[I]t is vital to the integrity of our adversary legal process that attorneys strive to maintain the highest standards of ethics, civility, and professionalism in the practice of law." (*People v. Chong* (1999) 76 Cal.App.4th 232, 243.) "Indeed, unwarranted personal attacks on the character or motives of the opposing party, counsel, or witnesses are inappropriate and may constitute misconduct." (*In re S.C.* (2006) 138 Cal.App.4th 396, 412.) We recognize that this litigation has been hard fought over a long period and that feelings have run high. Nonetheless, we remind counsel and the parties that "zealous advocacy does not equate with 'attack dog' or 'scorched earth'; nor does it mean lack of civility. [Citations.] Zeal and vigor in the representation of clients are commendable. So are civility, courtesy, and cooperation. They are not mutually exclusive." (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1537.) As another court put it, "Ad hominem arguments, of course, constitute one of the most common

_____

bar. The resolution asserts that another of Findleton's counsel, Michael Scott, previously represented a different contractor and, we infer, prevailed in litigation against the Tribe, contending that Findleton "has now turned to Mr. Scott to help him attempt to defraud the Tribe out of substantially more money in the present matter." Apparently, the Tribe unjustifiably infers that there is something improper about Findleton's retention of an attorney who has represented another client in a dispute with the Tribe. It also relies on hearsay evidence from the dispute with that contractor to attack Findleton indirectly, accusing him of such things as benefiting from graft on the Tribe's project, and as having performed defective construction.

Also, the resolution relies on hearsay social media and other hearsay documents about disputes between the Tribe and a declarant to ascribe to her a motive to lie in her declaration. It attacks another declarant, a former NCICS employee, based on emails it claims "establish a pattern and practice of non-cooperation with the Coyote Valley Branch of the NCICS."

errors in logic: Trying to win an argument by calling your opponent names ('Jane, you ignorant etcetera . . . .') only shows the paucity of your own reasoning." (*Huntington Beach City Council v. Superior Court* (2002) 94 Cal.App.4th 1417, 1430.) We agree. The Tribe's "unclean hands" arguments do not persuade us either that Findleton, his counsel and the declarants have been untruthful or that Findleton is not deserving of equitable relief.

On the other hand, the Tribe's disregard for multiple valid superior court orders over a four-year period persuades us that the disentitlement doctrine is appropriately applied to these appeals. The Tribe's conduct bears a strong resemblance to, but is more extensive than, the misconduct in many cases in which our courts have applied the disentitlement doctrine. (See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 166 [applying disentitlement to dismiss appeal from sanctions order where appellant failed to pay sanctions]; *Blumberg v. Minthorne, supra,* 233 Cal.App.4th 1384, 1389-1390 [defalcating trustee violated court order requiring her to file accounting and reconvey property, instead quitclaiming property to her daughter]; *Ironridge Global IV, Ltd. v. ScripsAmerica, Inc.* (2015) 238 Cal.App.4th 259, 261-262 [corporate debtor violated order compelling compliance with settlement by issuing stock to third parties and not to plaintiff]; *Gwartz v. Weilert* (2014) 231 Cal.App.4th 750 [defendants failed to comply with post-judgment freeze orders prohibiting transfer of assets]; *Stoltenberg, supra,* 215 Cal.App.4th at pp. 1228, 1234 [after plaintiff registered California judgment in New York, defendant refused to comply with New York subpoena regarding assets and New York court order compelling compliance]; *TMS, Inc. v. Aihara* (1999) 71 Cal.App.4th 377, 378-380 [judgment debtor refused to comply with order compelling response to

37

interrogatories to aid in enforcement of judgment].[11]  As in the above-cited cases, the Tribe has not only failed to pay sanctions and other money judgments but has obstructed the enforcement of those judgments.  It engaged in a fraudulent transfer of the casino assets that are subject to the judgments, obstructed debtor's exams by proffering witnesses who could not and would not answer questions and refused to comply with an order compelling it to produce documents pertaining to the fraudulently transferred assets.

Moreover, the Tribe's conduct goes beyond noncompliance with, and interfering with enforcement of, the five money judgments.  Since April 2017, the Tribe has contumaciously refused to comply with the superior court order compelling it to mediate and arbitrate the dispute in accordance with the terms of the contracts the Tribe itself prepared and entered into.  Its refusal continued after this court denied its petition for writ of mandate and the California Supreme Court denied review.  Thus, nearly 10 years after Findleton first filed the petition to compel mediation/arbitration, he has still not had his day in court, or, more specifically, in the arbitration tribunal selected by the Tribe to resolve the underlying dispute.  In the face of its flagrant disregard of the trial court's orders and judgments and its egregious obstruction of efforts to enforce them, the balance of the equities does not favor the Tribe.

---

[11]  As the court observed in *Stoltenberg*, "The disentitlement doctrine has been applied in a number of diverse cases,[] including cases such as this one in which an appellant is a judgment debtor who acts to frustrate or obstruct legitimate efforts in a trial court to enforce a judgment." (*Stoltenberg, supra,* 215 Cal.App.4th at pp. 1230-1232 & fns. 6, 7 [discussing cases].)

We pause to observe that, as the superior court found, a part of the Tribe's strategy for thwarting the superior court's orders was to enlist the aid of a previously unavailable tribal court at various points along the way. As we have already indicated, the Tribe cannot use that tactic as a shield to avoid the consequences of its ongoing noncompliance with presumptively valid superior court rulings. However, we emphasize that disentitlement here is not based on the tactics the Tribe employed to avoid and prevent compliance with the superior court's orders. The issue isn't *how* the Tribe flouted the superior court's authority but *whether* it did and continues to do so. It did and it does. Disentitlement here is based on the Tribe's repeated and continuing disobedience of superior court orders and monetary judgments, and its obstruction of efforts to enforce them.

Finally, we conclude with a few words about Findleton's further arguments that the CVTC is not a legitimate court and that in representing it was an NCICS court, the Tribe committed a fraud upon the superior court. We question whether it is within our purview to pass judgment on the legitimacy of a tribal court, especially when, as here, that issue is beyond what we need to decide. That said, it is certainly within our purview to enforce presumptively valid orders of the superior court in the case before us, whether or not a tribal court, formed years after a party properly invoked our courts' jurisdiction, has issued its own conflicting orders. This is especially so when, again as here, the litigant who invoked the tribal court's jurisdiction has repeatedly sought the aid of this court.[12] We will enforce the superior court orders and judgments by dismissing the Tribe's five pending appeals,

---

[12] The Tribe appealed an attorney fee award in *Findleton II*; it sought a writ of mandate from this court and review by the California Supreme Court in a challenge to the arbitration order; and it has filed five additional appeals challenging other superior court rulings.

without prejudice to it seeking reinstatement if it proceeds to mediation and arbitration and complies with the monetary judgments within 90 days.

## DISPOSITION

Case numbers A156459, A158171, A158172, A158173 and A159823 are dismissed, without prejudice to a motion for reinstatement if the Tribe complies with the superior court's orders compelling mediation and arbitration, imposing monetary sanctions and awarding prevailing party fees to Findleton within 90 days of the remittitur. This decision is final as to this court forthwith.

_____

STEWART, J.

We concur.

_____

KLINE, P.J.

_____

RICHMAN, J.

*Findleton v. Coyote Valley Band of Pomo Indians* (A156459, A158171, A158172, A158173, A159823)

41

Trial Court:  Mendocino County Superior Court

Trial Judge:  Hon. John A. Behnke

Counsel:

Ceiba Legal, Little Fawn Boland, Keith Anderson, for Defendant and Appellant.

Law Office of Dario Navarro, Dario Navarro, for Plaintiff and Respondent.